1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ZAMEER RIAZ AZAM,                                          No. C 05-510 MHP (pr)

      Plaintiff,                                  **ORDER GRANTING SUMMARY**
                                                          **JUDGMENT FOR DEFENDANTS**

    v.

CITY OF PLEASANTON; et al.,

      Defendants.
_____/

## INTRODUCTION

    Zameer Riaz Azam, a California prisoner at Folsom State Prison, filed this pro se civil
rights action under 42 U.S.C. § 1983. This case is now before the court for consideration of
defendants' motion for summary judgment. The court will grant summary judgment in
defendants' favor.

## BACKGROUND

    In 2003, Zameer Azam was in a relationship with Jennifer Bascom ("Jennifer"), who
was the mother of his 2-year old daughter, Alina Bascom. Jennifer also was the mother of 5-
year old Nicholas Bascom. Azam came to the attention of police on at least three occasions
in a 3-month period in late 2003. On August 26, 2003, he threatened and beat Jennifer.
Some of the violence occurred in front of Alina and Nicholas and resulted in a trip to the
hospital for Jennifer. See People v. Azam, 2006 WL 1756842, *1 (Cal. Ct. App. 2006)). On
August 30, 2003, Pleasanton police received reports that Jennifer had been abducted by
Azam. On November 1, 2003, Azam beat and threatened to kill Jennifer, dragging her back
to the house when she ran away trying to obtain help from a neighbor. Id. at *2.

The current case concerns the August 30 incident. On that day, an Amber Alert was issued for Alina and Jennifer by the Pleasanton police department after the police received reports from Jennifer's mother and two friends that Jennifer and Alina were unwillingly being detained by Azam. The Amber Alert was activated within about 2 hours of the first report of the abduction and was cancelled about 6 hours later when Jennifer and Alina showed up at a hospital unharmed. The defendants are the City of Pleasanton (California), the Pleasanton police department, and several members of the Pleasanton police department. The amended complaint asserts defendants are liable under § 1983 for defamation, malicious prosecution, and due process violations.

The following facts are undisputed unless otherwise noted:

A.      The Amber Alert System

In July 2002, the State of California adopted the California Child Safety America's Missing Broadcast Emergency Response (AMBER) Network (CCSAN). The network is a statewide notification system that disseminates pertinent information concerning child abductions to law enforcement agencies, media outlets and the public to aid in locating the child and abductor quickly. The California Highway Patrol (CHP) Emergency Notification and Technical Alert Center is responsible for statewide coordination of Amber Alerts, including activations of the Emergency Alert System messages that preempt radio and television broadcasts.

In October 2002, the California Attorney General, CHP and California Broadcasters Association published a manual ("the State manual") to assist local law enforcement agencies in establishing Amber Alert plans for their communities. According to the State manual, after receiving a report of a child abduction, a police supervisor must conduct a preliminary investigation and determine whether the Amber Alert activation criteria have been met: (a) it has been confirmed that an abduction has occurred, (b) the victim is 17 years old or younger (or of proven mental or physical disability), (c) there is reason to believe that the victim is in imminent danger of serious bodily injury or death, and (d) there is information available that, if disseminated to the general public, could assist in the safe recovery of the victim.

1  The Pleasanton police department adopted an Amber Alert protocol on October 1,

2  2002 that confirmed the department's participation in the CCSAN.  Before the August 30

3  activation, defendants Mickleburg and Buckovic (who were the police supervisors during the

4  Amber Alert on August 30), had received the written protocol and attended a training session

5  during which they reviewed the protocol and a training video.  The video and protocol

6  reviewed the criteria used to activate an Amber Alert and the related procedures.  The Amber

7  Alert at issue in this case was the only time the Pleasanton police department had activated

8  the Amber Alert system.

9  B.     The Events Leading To The Criminal Charges

10        1.      August 26 events

11        On August 26, 2003, Pleasanton police officer James Marshall responded to a possible

12  domestic violence call at the Valley Care Medical Center at about 3:23 a.m. and met with

13  Jennifer.  Jennifer told officer Marshall that Azam had beaten her at her residence and then

14  drove her to the hospital.  As Jennifer had described it, part of the beating took place in front

15  of their 2-year old daughter Alina and Azam told Jennifer that everyone was going to die

16  except for their daughter.  Eventually, the beating stopped when Jennifer went limp, feigning

17  that she had been suffocated.  This, according to Jennifer, caused Azam to panic.  He

18  eventually took her to the hospital and left her there.  Marshall Decl., Exh. 1, p. 3.  Before he

19  left, he told Jennifer "to tell the truth" about what had happened, "but that he wasn't going

20  back to jail.  Azam told [Jennifer] that he would rather die or kill himself than to go back to

21  jail." Id. at 4; see Azam Decl., ¶ 72.  Jennifer said Azam had beaten her on two other

22  occasions and there was a restraining order that "prevents him from treating her badly, but

23  does allow him to visit her."  Marshall Decl., Exh. 1, p. 4.  Officer Marshall obtained

24  printouts from dispatch that showed three domestic violence restraining orders for Jennifer.

25  He completed a roll call information report advising officers to be on the lookout for Azam.

26        Officer Marshall prepared another police report after he had further contact with

27  Jennifer on August 28.  Jennifer told him that Azam had telephoned her approximately eight

28  times on August 27 and fifteen times on August 28.  During one of the telephone calls, Azam

3

reportedly told Jennifer "something to the effect that if he was going back to jail, he might as well finish what he started." Marshall Decl., Exh. 1, p. 5.

Officer Marshall also spoke with Jennifer's mother, Joan Bascom ("Joan"), who said that she had overheard the phone call and heard Azam make the statement that he might as well finish what he had started if he was going back to jail.

On August 29, Azam and Jennifer spent the day and evening together amicably.

Based on what officer Marshall learned, on September 2, 2003, a warrant was issued for Azam's arrest for violations of California Penal Code § 273.5(a) and § 422.

2.    <u>August 30 events</u>

On August 30, 2003, Jennifer left her son with her mother and drove away with her daughter around noon. She told her mother she was going to visit Azam's relatives.

At about 3:51 p.m., the Pleasanton police department received a call from Jennifer's friends, Isabelle and Coreen, who expressed concern about Jennifer's safety based on the couple's domestic violence history and her tone and comments during telephone conversations that day. Coreen and Isabelle both expressed concern to police dispatch for the safety of Jennifer and Alina, and said that Jennifer was with Azam against her will.

At about 3:55 p.m., Pleasanton police sergeant Pat Walsh and Pleasanton police officer Aaron Fountain were assigned to investigate the possible abduction. Sergeant Walsh learned that there were several restraining orders in effect that prohibited Azam from contacting Jennifer and that Azam had fled after beating Jennifer and taking her to the hospital on August 26.

Sergeant Walsh called Coreen at about 5:10 p.m. Coreen said she had spoken by telephone with Jennifer at about 11:30 a.m. and that Jennifer told her that she intended to drop off her son at her mother's house and then have lunch with Azam's mother. Jennifer told Coreen that she did not intend to meet Azam and discussed with Coreen calling 9-1-1 if Azam showed up. Coreen also told sergeant Walsh that she had called Jennifer's cell phone number at about 1:30 p.m. and Azam had answered. Coreen immediately believed something was wrong because of the restraining orders she believed were in place. Azam

4

was very angry, swore at Coreen, asked her why she was calling Jennifer and hung up the phone. Coreen repeatedly called back for over an hour, but Jennifer's phone was turned off. Coreen was certain that Jennifer, Azam and Alina were driving in a car, but she didn't know where they were. Coreen also told sergeant Walsh that at about 3:00 p.m. she called Jennifer's cell phone, Azam answered again and yelled and threatened Coreen. When Coreen asked to talk to Jennifer, Azam continued to yell at her. Coreen stated that she told Azam he could go to jail, and Azam told her that he did not care, would not go back to jail, would rather die than go back to jail, and would kill Coreen and as many people as he could. Coreen told sergeant Walsh that she then spoke with Jennifer, who sounded distressed and very scared. According to Coreen, a child was crying in the background, and Jennifer gave short 1-2 word answers, said "no" when asked if she was "okay," and replied that she did not know why she was with Azam. Walsh Decl., ¶ 17. The telephone line went dead; Coreen unsuccessfully tried to call back.

Sergeant Walsh spoke with Azam's mother, Jubeda Azam, who he thought sounded evasive. Jubeda told sergeant Walsh she hadn't seen Azam or Jennifer and had no lunch plans with Jennifer that day.

Sergeant Walsh spoke with Isabelle at about 5:30 p.m. Like Coreen, Isabelle was afraid for Jennifer's safety. Isabelle stated that when she called Jennifer at about 1:30 p.m., Azam answered, sounded agitated and gave the telephone to Jennifer who sounded very frightened and had a trembling voice. Isabelle stated that she believed Jennifer did not want to be there, that Jennifer had answered questions in rapid, short one-word answers. Isabelle told sergeant Walsh she could hear Alina in the background on the call, it sounded like they were in a car, and Jennifer answered that she was okay and Azam had not hurt her. Isabelle tried unsuccessfully to call back after the cell phone call disconnected.

Based on the statements from Isabelle and Coreen, sergeant Walsh believed that Alina and Jennifer were in danger and had been kidnapped. He shared the information with other members of the police department. Sergeant Walsh did not have any direct contact with Jennifer while she was with Azam on August 30.

5

Meanwhile, officer Fountain called Jennifer's mother, Joan Bascom. Joan said she believed that Jennifer and Alina had been kidnapped by Azam and were in physical danger. Joan told officer Fountain that: Jennifer and her children had been living with her since Azam had beaten Jennifer on August 26; Jennifer had told Joan that she was going to visit Azam's grandparents in San Francisco and left the house at about 12:45 p.m. with Alina; and Joan had no contact information for any of Azam's family members. Joan also told officer Fountain that, in the past couple of days Jennifer had received numerous threats from Azam that he would kill Jennifer, her children, and Joan if the charges against him were not dropped. During officer Fountain's conversation with Joan, she received two phone calls at about 5:27 p.m. and 5:43 p.m., both of which she said were from Jennifer. In those calls, Joan said Jennifer told her she was calling from her cell phone and did not know where she was, but believed she was in San Francisco or South San Francisco; that they had met Azam at an apartment building where Azam had left his own car and got into Jennifer's car; that Jennifer accompanied Azam unwillingly after he threatened to kill Jennifer, her children, and Joan; and that Azam would not let her go until all previous charges against him were dropped. Joan told officer Fountain that she told Jennifer to leave or call 9-1-1, but Jennifer responded that she could not because she was being watched by several of Azam's friends even though he "'was out of it.'" Fountain Decl., ¶ 13. According to Joan, Jennifer also told Joan she could not call 9-1-1 because her cell phone battery was dying. They lost contact, which Joan assumed was because the phone had lost power. Based on the information he learned, officer Fountain "believed that [Jennifer] and Alina had been kidnapped/abducted by [Azam], believed that Alina was in danger of serious bodily harm or death based on the statements that [Azam] said he would kill her if the charges against him were not dropped, and had information about [Azam,] Alina and the car such that the public could assist in locating the child, suspect and the vehicle." Walsh Decl., ¶ 15.

Officer Fountain reported the situation to his supervisor, sergeant Barry Mickleburgh, and reviewed the facts and criteria to activate an Amber Alert. Officer Fountain also ran a records check and learned that Azam was the registered owner of a vehicle. An officer drove

to the apartment complex and found Azam's unoccupied car but not Jennifer's. Officer Fountain went with other officers to Jennifer's apartment and determined that Jennifer and Alina were not in the apartment.

After reviewing the facts with officer Fountain and a police dispatcher, sergeant Mickleburgh referred to the Manual and determined that the criteria to activate an Amber Alert had been met. Lieutenant Joseph Buckovic also reviewed the facts with sergeant Mickleburgh and the investigating officers and concurred that the criteria for an Amber Alert had been met.

Before 5:20 p.m., sergeant Mickleburgh called the CHP's ENAC and reviewed with the ENAC duty officer the facts and Amber Alert criteria. The duty officer concurred that the criteria had been met and authorized an Amber Alert to locate Alina. The CHP sent personnel to assist in the investigation.

An Amber Alert was activated. Emergency Alert System messages were broadcast on radio and television, a text message flash was disseminated to law enforcement agencies and media outlets, and changeable message signs on freeways flashed the message. The information disseminated provided that Azam had kidnapped Jennifer and Alina. It also described Azam as a Middle Eastern male. The parties dispute whether the message included a statement that Azam was armed and dangerous.

A "Wanted" poster was sent to law enforcement agencies. The "Wanted" poster was prepared by Pleasanton police officer Daly Harnish, who accessed the Alameda County Computerized Arrest and Booking System (CABS) database to gather information about Azam. CABS listed Azam's race as "Middle Eastern" and had photographs of Azam. (Azam disputes that he was listed as Middle Eastern in CABS, but does not support his speculation with any evidence on this point.) The Amber Alert network uses the Technology to Recover Abducted Kids (TRAK) system to disseminate information, and the TRAK system draws information from CABS. Officer Harnish used the TRAK system to obtain information from CABS to develop TRAK fliers and the "Wanted" poster that were disseminated to law enforcement agencies and local news stations. The fliers and poster

7

included a December 13, 2002 photo of Azam and his description, listed his race as "Middle Eastern" and had information about the incident and vehicle.  During the investigation, someone allegedly determined that Azam had a firearm registered to him (although Azam denies that he had a weapon).

Sergeant Mickleburgh also drafted and issued a press release at about 9:00 p.m. that day containing information about the abduction.  That press release did not identify Azam as armed and dangerous.

Jennifer had telephone conversations with the Pleasanton police department on the evening of August 30 while she and Alina were in the car with Azam.  Sergeant Mickleburgh talked to her during one of these calls; when asked, she would not tell him where she was.  Jennifer also did not respond to other questions.  Sergeant Mickleburgh told her to call 9-1-1 so the CHP could locate the source of the call and locate her and Alina.  Jennifer's calls to the police department and her non-responsiveness led Mickleburgh to believe that Jennifer and Alina were in danger.

At about 11:50 p.m., the Pleasanton police dispatch office was notified that Jennifer and Alina were in the emergency room at the Walnut Creek Kaiser Hospital.   Pleasanton police officers responded to the hospital.  The Amber Alert was cancelled about 15 minutes later, at about 12:03 a.m. on August 31, 2003.

Pleasanton police officer Jeff Laugero was briefed on the case at about 7:00 p.m. on August 30.  He ran a records check on Azam that indicated he had been arrested by the Livermore police on January 24, 2002 for battery of Jennifer.

When they learned Jennifer and Alina were at the Kaiser hospital in Walnut Creek and unharmed, officer Laugero went with detective Harnish to interview Jennifer.  Before Jennifer spoke with police, she spoke with Ms. Flood, a licensed mental health worker at the Kaiser hospital.  After speaking with Jennifer, Flood told officer Laugero that Jennifer told her that Azam had made continuous threats against Jennifer, her son and her mother.  Flood reported that Jennifer told her that Azam was on crystal methamphetamine, was dangerous and unpredictable, and became extremely agitated when he saw the Amber Alert as they

8

drove across the San Mateo Bridge.

Detective Harnish and officer Laugero then talked to Jennifer. Jennifer told them of the history of her relationship with Azam and the August 26 beating. Jennifer told the officers "that in the days following the incident she had several conversations with [Azam] during which he demanded that she change her story or he would 'finish what he started.' [Jennifer] took this statement to mean that he would kill her, her children, or her mother. He stated that he would 'do whatever he had to' in order to avoid going back to jail. During one meeting [Jennifer] told him that she would change her story, but that it would not matter because the police would still go forward with the charges." Laugero Decl., ¶ 13. Jennifer also told the officers that Azam "told her that he would kill her to 'make going to jail worth it.'" Id. at ¶ 14. She also told them that she had talked with Azam on August 29 and he told her that they needed to meet to talk about changing her story. He asked her to meet him on August 30 to take him to his grandparents' house to discuss the charges. Jennifer told the officer she believed Azam would harm her or her family based on his numerous threats and believed that if she met him she could calm him down and prevent him from hurting her family. She told the officer that she had spoken with Azam several times on the morning of August 30 and he became increasingly irritated that she was delayed in meeting with him – a delay that occurred because she wanted to leave Nicholas with her mother to keep him away from the unpredictable Azam. When Azam got in Jennifer's car, he immediately started yelling at her for being late and accused her of cheating on him. Jennifer told the police that Azam controlled her cell phone, not allowing her to make calls and monitoring incoming calls to decide whether he or she should answer the call. Jennifer told the police that when she talked to her friend Isabelle, she told her everything was fine because Azam was listening to their conversation, but she was trying to let her friend know that things were not all right and she was unable to tell her friend about Azam's threats. Jennifer told the officers that they drove around, made several stops, and Azam accused her of cheating on him such that she was "'asking him to kill her,'" Laugero Decl., ¶ 22. Jennifer also told the police that when they arrived at any location, Azam would take the car keys so that she and Alina could not

leave. One of their stops that day was at Azam's grandparents' home where, according to Jennifer, she told them she was going to call the police and change her story about the battery. Jennifer then called her mother and told her everything was fine but tried to imply that she was not safe. Jennifer then told Azam that she had made arrangements to go to the Pleasanton police department to change her story, but he would not let her and Alina go to the police department. Jennifer told the police she acted cooperative and agreed to change her story so Azam would let her and Alina go. Jennifer reported to police that when they saw the Amber Alert broadcasts while on the San Mateo Bridge, Azam became very upset and began hitting the dashboard and yelling, which caused her to think he would kill her. They drove around looking for a place to leave Azam and eventually he got out of the car at a stop sign saying, "'you know what to do,'" which Jennifer said she understood to mean that she had to change her story or he would come after her and/or her family. Laugero Decl., ¶ 32. (Azam agrees that he made the statement but says he meant that she was to go to the police and explain that it was all a mistake. Azam Decl., ¶ 159.) Jennifer told the officers that she then drove to the Kaiser hospital.

When Laugero ran a records check, he found records that the Dublin police department had charges pending against Azam for domestic violence, that Azam was on court probation and that a restraining order was issued in connection with that case prohibiting him from contacting or threatening Jennifer and from dissuading her from making a report to police. (Azam disputes that the restraining order prohibited him from contacting Jennifer.) A restraining order stated that he could not, among other things, "annoy, harass, . . . threaten. . . . or otherwise disturb the peace" of Jennifer or "attempt to or actually prevent or dissuade any victim or witness" from testifying. Azam Decl., p. 48 and Exh. V.)

Based on his interview with Jennifer and the witness statements, Laugero believed that Jennifer "did not go willingly with [Azam], but did so because it was the only way she believed she could protect herself and her family from injury or death." Laugero Decl., ¶ 36. On September 1, 2003, officer Laugero prepared an arrest warrant.

10

On September 1, Judge Hyde signed an arrest warrant for Azam for violations of California Penal Code § 273.5 (domestic violence), § 207(a) (kidnapping), § 236 (false imprisonment), 422 (making a criminal threat), § 137(b) (intimidating a witness), and § 166(a)(4) (disobedience of a court order).

### 3. November 1 events

Azam came to the attention of police again on November 1, 2003, when he once again beat Jennifer. Part of the beating was inflicted while she held Alina. When Jennifer broke free from him and ran across the street to a neighbor's house for help, Azam caught up with her and dragged her back toward her home. "A neighbor was alerted by [Jennifer's son Nicholas] and called the police. When police arrived, [Azam] released [Jennifer] and ran back into the house." Cal. Ct. App. Opinion, 2006 WL 1756842, *2.

## C. The Arrests And Criminal Prosecution

After the August 30 events, an arrest warrant was issued for Azam. He surrendered to police on September 5, 2003, and was jailed. Azam Decl., ¶ 174. His bail was set at $500,000. (He claims that the bail was set at that amount because of false charges filed by the police, id. at ¶ 175, but produces no competent evidence as to how the bail was allocated between the allegedly false charges and the indisputably valid ones.)

On September 8, 2003, the District Attorney filed a criminal complaint charging Azam with making criminal threats (Cal. Penal Code § 422), false imprisonment by violence (Cal. Penal Code § 236), and witness intimidation (Cal. Penal Code § 137(b)) for the August 30 events.

Jennifer failed to testify at the preliminary hearing set for September 14, 2003. The District Attorney moved to dismiss the case and Azam was released from jail that day. Jennifer and Alina moved in with Azam that day, and Jennifer and Azam reconciled. He was arrested again and jailed again on November 1, 2003, after once again beating Jennifer.

On February 6, 2004, the Alameda County District Attorney filed an information with numerous counts against Azam. The charges pertaining to August 30 were for making criminal threats (Cal. Penal Code § 422), false imprisonment by violence (Cal. Penal Code §

11

236), and witness intimidation (Cal. Penal Code § 137(b)).

On March 8, 2004, the District Attorney filed an amended information that dropped the false imprisonment charge but kept the charges for making criminal threats and witness intimidation, and added a charge of disobeying a domestic relations court order (Cal. Penal Code § 273.6(a)).

On September 14, 2004, the district attorney tried to file a second amended information that would have changed one charge from disobeying a domestic relations court order to disobeying a court order (Cal. Penal Code § 273.6(a), § 166(a)(4)). The court denied the request. At the jury trial that month, the court granted the defense motion to dismiss the charge of disobeying a domestic relations court order; as a result, that charge never was decided by the jury.

The jury found Azam guilty of numerous charges relating to the August 26, August 30, and November 1 events. As to the August 30 events, he was found guilty of (1) making criminal threats to Jennifer and (2) attempting to induce false testimony, a lesser related offense to the § 137(b) witness intimidation charge. As to the events on the other days, Azam was convicted of kidnapping, two counts of inflicting corporal injury on a child's parent, and two counts of making a criminal threats. His conviction was affirmed on appeal. Azam was never charged with kidnapping Alina.

D.    The Child Dependency Proceedings

The Alameda County Social Services Agency, Children and Family Services ("Social Services") investigated matters concerning Azam's alleged abuse of Jennifer and her two minor children, Alina and Nicholas. Social Services employees obtained police reports from the Pleasanton Police Department and interviewed police officers, family members, the children, and Jennifer.

Social Services filed a Juvenile Dependency Petition that asserted under California Welfare and Institutions Code § 300(b) that both Nicholas and Alina were at risk. The part of the petition Azam submitted alleged that the "mother failed to protect the minors from domestic violence between the mother and the alleged father of Alina" and described

12

1  information supporting that contention, including the criminal charges against him for

2  August 30 as well as his conduct and threats on August 26, his arrest on October 30 for

3  violating an order of protection, and three other incidents between December 2002 and

4  January 2003 – the nature of which was not identified because Azam produced only page 5

5  of a multi-page petition.  Azam Decl., Exh. P; cf. Exh. Q at p. 5.  The evidence plainly shows

6  that the problems that formed the basis for the action went far beyond the August 30 incident.

7  See, e.g., Azam Decl., Exh B, RT 19; Exh. K, RT 16-17; Exhs. P and Q.  The judge at the

8  child custody proceeding recognized that the criminal charges listed  were only charges that

9  Azam was facing, and the child custody court was "not having a trial on the charges here

10  today."  Azam Decl., Exh. B, RT 16.  After further proceedings over several months, the

11  court awarded full legal and physical custody of Alina to Jennifer.

### VENUE AND JURISDICTION

13  Venue is proper in the Northern District of California because the events or omissions

14  giving rise to the claims occurred in Alameda County, which is located within the Northern

15  District.  See 28 U.S.C. §§ 84, 1391(b).  This Court has federal question jurisdiction over this

16  action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

### LEGAL STANDARD FOR SUMMARY JUDGMENT

18  Summary judgment is proper where the pleadings, discovery and affidavits show that

19  there is "no genuine issue as to any material fact and [that] the moving party is entitled to

20  judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant summary judgment

21  "against a party who fails to make a showing sufficient to establish the existence of an

22  element essential to that party's case, and on which that party will bear the burden of proof at

23  trial . . . since a complete failure of proof concerning an essential element of the nonmoving

24  party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477

25  U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit

26  under governing law, and a dispute about such a material fact is genuine "if the evidence is

27  such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v.

28  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995). Plaintiff's amended complaint, which superseded earlier pleadings, is not verified and is not considered as evidence. Plaintiff's incorporation by reference of the amended complaint in his 66-page declaration is insufficient to make the amended complaint a de facto sworn statement.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

## DISCUSSION

A.    Due Process

In his amended complaint, Azam alleges that the defendants created and pursued false charges against him in violation of his constitutional rights. In his opposition to the motion for summary judgment, Azam clarifies that his due process claim is based on the police use of fabricated evidence to charge and prosecute him. Defendants argue that this claim fails because the police had probable cause to arrest and pursue criminal charges against Azam for his August 30 actions.

A person has a due process right "not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc). This is akin to the right not have the

prosecution use perjured testimony to secure a conviction. See id. at 1075 (citing Pyle v. Kansas, 317 U.S. 213, 216 (1942)). Intentional fabrication of evidence is required; it is not enough that the police failed "to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result." Id. at 1076-77. The plaintiff must show that the officer continued his investigation "despite the fact [he] knew or should have known that [plaintiff] was innocent or [the officer] used investigative techniques that were so coercive and abusive that [he] knew or should have known those techniques would yield false information. Cunningham v. Perez, 345 F.3d 802, 811 (9th Cir. 2003).

Azam contends that the defendants "did know that plaintiff was innocent due to Ms. Basom [sic] stating to them that she was not kidnapped/abducted or held against her will, See (Exhibit A1-A4, H) I. Also that she was not pressured to change her story, see (Exhibit H-I). Yet the defendant's [sic] continued their investigation, filed false affidavits, filed false charges, and continued to defame plaintiff." Opposition brief, pp. 31-32. The evidence to which Azam cites is insufficient to raise a triable issue of fact that defendants subjected him to an arrest or criminal charges based on known false evidence. Azam does not submit a declaration from Jennifer and instead offers second-hand reports of her statements and excerpts of her testimony in his criminal case. Azam's exhibits H and I – that purport to be transcripts of recorded conversations he had with Jennifer – are inadmissible hearsay insofar as he offers them to prove the truth of any statements Jennifer allegedly made during those conversations. Azam's Exhibits A1 - A4 are excerpts of transcripts of Jennifer's testimony in his criminal case. Exhibit A1-A2 are from the January 2004 preliminary examination, Exhibit A3 is from an evidentiary hearing at his trial in August - September 2004, and Exhibit A4 is part of Jennifer's trial testimony on September 13, 2004.

All of Jennifer's testimony post-dates defendants' allegedly wrongful activity and came "too late to serve as evidence that defendants knew" Azam was innocent. Devereaux, 263 F.3d at 1078 n.1. The earliest testimony from Jennifer is from a preliminary examination in January 2004 – after the Amber Alert was activated, after the original criminal complaint was filed, after both arrests of Azam, and after defendant Laugero provided information for

15

the child custody petition. Jennifer's testimony is only of value insofar as it is proof of what she told police before they acted, e.g., what she told them on August 30. Jennifer's testimony in the criminal case does not save Azam from summary judgment because her testimony does not dispute enough of what the police reported she said to undermine their reports: (1) Jennifer testified that she did not tell officers at the hospital that she had been abducted, RT 103, but Laugero' report did not say that she said she had been abducted (in the sense of being physically grabbed or pushed into a car), (2) Jennifer testified that she talked to a policeman on the phone while she was with Azam but doesn't recall what she said to him, RT 380, so that doesn't show a triable issue of fact as to the correctness of the police report about that conversation, and (3) Jennifer testified that she lied to the police at the hospital when she said where she dropped Azam off and that he had retained the car keys whenever they stopped, RT 384-387, but her lies to police provide no basis for believing the police report to have been an inaccurate recitation of her misstatements.

Jennifer apparently was at least a difficult witness for prosecutors, as she changed her story several times and was evasive when she didn't like where the questioning was headed. See Azam Decl., Exhs. A1 - A4, RT 106-108, 310. Her testimony also must be viewed in light of the fact that she and Azam earlier had discussed the charges after the August 30 events. See RT 105, 307-309, 396. At the preliminary hearing, her story was that she went secretly but willingly with Azam on August 30, and never explicitly told anyone that she had been kidnapped. Her testimony indicated that Azam's mood swung back and forth (from normal to angry) and that her level of apprehension (from calm to fearful) moved in tandem with his mood. See, e.g., RT 89-90, 93, 95-96, 105. Jennifer stated that she had not told anyone that Alina had been kidnapped, that she (Jennifer) had been kidnapped, that she was being held against her will, that she wanted an Amber alert activated for her, that she needed to be rescued, or that there was something wrong with what was happening in the car. RT 99. Jennifer did, however, admit that during telephone conversations she and/or Azam may have led her mother and friends to believe something was amiss:

16

| | |
|---|---|
| Q: | Now, did you, in your opinion, ever lead anyone to believe that you had been taken by – against your will by Mr. Riaz to San Mateo. |
| A: | No. Riaz did that all on his own. |
| Q. | Riaz did what? |
| Q. | Riaz talked to Coreen, started yelling at her, threatening her, whatever, and she got concerned. |
| Q. | But you never did? |
| A. | Well, when I talked to my mom, she was mad that I was with him and of course she was asking me why and stuff like that. I never told her I went against my will but <u>but I probably did imply that I didn't want to be with him.</u> |
| Q. | But that wasn't true? |
| A. | Well, part of the day it was and part it wasn't. |

RT 100 (emphasis added). When asked if Azam was pressuring her to dissuade her from testifying about the August 26 events, she responded that it "was definitely the topic of the day." RT 104. She denied that she ever told the police that she was abducted and that she told them the same story she was testifying to and "[i]f things got blown up, that's just when you talk from person to person to person, that's what happens." RT 104.

Jennifer's testimony does not raise a triable issue of fact that the police pushed forward knowing the charges were false. Jennifer was just one of several sources of information that the police had available to them. The police also had statements from Joan, Isabelle, Coreen, Jubeda, and Ms. Flood, reports regarding earlier domestic violence and phone calls, as well as Azam's criminal record and the restraining orders.

Azam fails to provide any evidence that would permit a reasonable jury to find that the police knew or should have known that he was innocent when they arrested and charged him. The police had probable cause to believe that Azam had kidnapped or falsely imprisoned Jennifer and Alina on August 30. It is undisputed that the defendants had available to them the following information: (1) Jennifer's reports just a few days earlier Azam had beaten her and that part of the beating took place while she was holding Alina, as well as that Azam had called her numerous times in the few days after she reported the beating; (2) Joan's report to police that Jennifer told her in two phone calls that day that she had accompanied Azam unwillingly after he threatened to kill Jennifer and her family and would not let her go until the charges were dropped; (3) reports from Isabelle and Coreen that Jennifer's demeanor and statements during their phone calls led them to believe she was

17

with Azam against her will; (4) Azam's history of domestic violence against Jennifer,

Cf. Hart v. Parks, 450 F.3d 1059, 1066 (9th Cir. 2006) (history of same kind of criminal

activity lends some support for finding of probable cause); (5) restraining orders to protect

Jennifer from Azam (although there is some dispute as to how many restraining orders were

in place and what exactly they prohibited Azam from doing); and (6) Jennifer and Alina were

not at home and were on the road in an undisclosed location with Azam in Jennifer's car.

The legal inquiry focuses on the information before the law enforcement officers as

they acted and not – as Azam would have it – on whether Azam did the crimes for which he

was arrested.  Although none of the witnesses told police that Jennifer explicitly said she and

Alina were being kidnapped, Joan, Isabelle and Coreen had talked to her and conveyed the

same message to police: they believed she was with Azam against her will.  And although

none of the witnesses told police that Azam was making any threats against Alina in

particular on August 30, the same three witnesses reported she was in the car and Coreen and

Isabelle reported that Azam had talked to them in an angry and hostile manner while a baby

was crying in the background.  Azam's mother did provide contrary information, i.e., that

Jennifer called her and said she was okay, but that was nowhere near enough to cause police

to disbelieve the other witnesses or to believe there was not probable cause to believe he had

kidnapped or falsely imprisoned Jennifer.

The police also had probable cause to believe that Azam engaged in witness

intimidation on August 30, for the reasons discussed below in the analysis of the malicious

prosecution claim with regard to the § 137(b) charge.

Viewing the evidence and inferences therefrom in the light most favorable to Azam,

no reasonable jury could conclude that defendants filed and pursued charges based on known

fabricated evidence.  Defendants are entitled to summary judgment on the due process claim.

B.    Malicious Prosecution

A malicious prosecution claim generally is not actionable under § 1983.  However,

where a prosecution is conducted with malice and without probable cause, and with the intent

to deprive a person of equal protection of the laws or another specific federal constitutional

United States District Court

For the Northern District of California

right, a due process claim may be stated. See Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995); see also Awabdy v. City of Adelanto, 368 F.3d 1062, 1066 (9th Cir. 2004); Usher v. City of Los Angeles, 828 F.2d 556, 561-62 (9th Cir. 1987). A plaintiff must then also demonstrate all of the elements of malicious prosecution under state law, which in California are initiation of criminal prosecution, malicious motivation and lack of probable cause. See Usher, 828 F.2d at 562. "Probable cause exists when the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense. . . . Police must only show that, under the totality of the circumstances, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime." Hart, 450 F.3d at 1065-66 (quotation marks, brackets and citations omitted). In determining whether probable cause exists, police "may rely on hearsay and other evidence that would not be admissible in a court." Id. at 1066.

      1.     Influencing A Witness And Criminal Threats Charges

The parties agree that Azam cannot pursue a malicious prosecution claim for the charges that he attempted to influence a witness' testimony and made criminal threats against Jennifer on August 30, see Cal. Penal Code § 137(c) and § 422, because he was convicted of those offenses.

      2.     Witness Intimidation Charge

The parties disagree whether Azam's conviction under § 137(c) also bars him from pursuing a malicious prosecution with regard to the charge under § 137(b). Although subdivisions (b) and (c) both pertain to influencing testimony, the latter appears to be a lesser-related offense to the former and is only a misdemeanor. Subdivision (b) makes a person liable if he "attempts by force or threat of force or by the use of fraud to induce" someone to give false testimony or withhold true testimony. Subdivision (c) imposes liability for a person who knowingly induces another person to give false testimony or withhold true testimony. In theory, a conviction under § 137(c) does not necessarily bar a malicious prosecution claim for pursuit of a charge under § 137(b), as might be the case if

there is no evidence of a threat, force or fraud being used to influence testimony. That does not end the matter but only advances the analysis to consideration of whether Azam shows a triable issue of fact on his claim that he was maliciously prosecuted on the § 137(b) charge.

Azam fails to provide any evidence that would allow any reasonable jury to conclude that there was an absence of probable cause to charge him under § 137(b). Azam's conviction under § 137(c) conclusively establishes that he knowingly induced Jennifer to give false testimony or withhold true testimony and his conviction under § 422 conclusively establishes that he willfully threatened to commit a crime which would result in death or great bodily injury to her. Any gap between his threats to kill or cause great bodily injury to Jennifer and his attempt to induce her to give false testimony was bridged by the substantial information the police had from witnesses and Jennifer that Azam was threatening her to cause her to change her story about the August 26 beating. The evidence is undisputed that: (1) Jennifer told a police officer on August 28 or 29 that Azam had called her more than 20 times on August 27-28 after she reported being beaten by him on August 26; (2) Joan told a police officer on August 30 that over the past couple of days, Jennifer had received numerous threats from Azam that he would kill Jennifer and her family if the charges against him were not dropped; (3) at about 5:30 on August 30, Joan told a police officer that she had just received a call from Jennifer who said she (Jennifer) accompanied Azam unwillingly after he threatened to kill Jennifer and her family and that Azam would not let her go until all previous charges were dropped; (4) when interviewed at the hospital, Jennifer said that Azam had several times demanded that she change her story or he would "'finish what he started'" (which she understood to be a death threat to her and her family), that she was afraid that he would carry out his threats if she didn't meet with him, and that she agreed to change her story so that Azam would let her and Alina go free. Based on this information that was indisputably known to the Pleasanton police officers, there was probable cause to prepare an arrest warrant for Azam for attempting to intimidate a witness by threat of force, see California Penal Code § 137(b). There was information favorable to Azam also known to the police (e.g., his mother's statement to police on August 30 that Jennifer had told her she was

voluntarily with Azam), but it was not of such force as to undermine the existence of probable cause to arrest him for the offense.   Even if Jennifer had denied to police that she had been threatened, the nature of witness intimidation is such that police reasonably could discount such statements in light of information that received from third parties, i.e., her denial might indicate that Azam had succeeded in intimidating her as a witness.

Jennifer's testimony at the preliminary examination in January 2004 did not negate the information that the police received that Azam had threatened to harm her to influence her testimony.   When asked whether Azam was pressuring her to dissuade her from testifying about the August 26 events, Jennifer responded that it "was definitely the topic of the day," RT 104, and that he had made threatening and menacing comments during their drive.   RT 105.   Azam agrees that there was discussion on August 30 about what Jennifer should say about the August 26 incident and they had agreed with his uncle's suggestion to tell the police a masked intruder had attacked Jennifer.   Azam Decl., ¶ 125.

3.    Kidnapping And False Imprisonment Charges

The police had probable cause to arrest Azam on the kidnapping and false imprisonment charges for the events on August 30 for the reasons explained earlier in the discussion of the due process claim.   Considering the evidence under a totality of the circumstances, a prudent person would have concluded that there was a fair probability that Azam had kidnapped and falsely imprisoned Jennifer as well as the child who was with them.

Azam asserts that officer Laugero's affidavit in support of the arrest warrant was false, but fails to provide any evidence to support that assertion.   Jennifer's failure to testify at the preliminary examination in September 2003 does not prove that anything in Laugero's affidavit was false or that there was not probable cause to arrest Azam a couple of weeks earlier.   Also, Jennifer's testimony in January 2004 that Azam had not forced her to accompany him on August 30 does not show that such information was available to the police when the arrest warrant was sought in September 2003.   Further, Azam does not contest that the police had received the reports from Coreen, Isabelle and Joan on August 30 and has not shown that Jennifer did not make the statements to Ms. Flood at the hospital that

were mentioned in Laugero's police report.

With the state of the evidence before them, police officers had probable cause to charge Azam with kidnapping and false imprisonment, even though the prosecutor never charged him with kidnapping and dropped the false imprisonment charge before trial. The existence of probable cause to arrest him for these crimes defeats his malicious prosecution claim as a matter of law. See Hart, 450 F.3d at 1071.

### 4. Violation of Domestic Relations Court Order

The filing of a criminal complaint immunizes investigating officers from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining probable cause for an accused's arrest exists at that time. See Newman v. County of Orange, 457 F.3d 991, 993 (9th Cir. 2006), cert. denied, 127 S. Ct. 1383 (2007). This presumption that a prosecutor exercises independent judgment in deciding to file charges cannot be rebutted simply because plaintiff's version of an incident conflicts with that of the law enforcement officers involved. Id. at 996 (where plaintiff had no evidence of material omissions, or inconsistent police or eyewitness accounts, he could not demonstrate a genuine issue of material fact as to whether the prosecutor exercised independent judgment therefore defendant entitled to summary judgment on malicious prosecution claim). It may, however, be rebutted by showing "for example, that the prosecutor 'was pressured or caused by the investigating officers to act contrary to his independent judgment' or that the investigating officers presented the prosecutor with 'information known by them to be false.'" Blankenhorn v. City of Orange, 485 F.3d 463, 482-84 (9th Cir. 2007).

Azam does not present any evidence that the district attorney's decision to bring this charge was not made independent of the police department. Azam offers his own conflicting version of what transpired on August 30, but that is insufficient to rebut the presumption that the prosecutor acted independently in making her charging decision. There also is a dearth of evidence that the officers presented the prosecutor with information known by them to be false. None of the officers claimed to have first-hand knowledge of Azam's activities on

United States District Court
For the Northern District of California

1   August 30 and all were clearly proceeding based on reports from members of the public and

2   were computer records for the information about the restraining orders. Azam has not shown

3   that Isabelle, Coreen and Joan did not make their reports to the police or that there was any

4   reason for the police to disbelieve them. Even when Jennifer talked to the social worker and

5   police at the hospital, she made no statement that would have led the police to believe that

6   they lacked probable cause to charge Azam with violation of a restraining order.

7       Defendants are entitled to judgment as a matter of law on the malicious prosecution

8   claim as to all the charges against Azam.

9   C.   <u>Defamation</u>

10      Defamation alone does not amount to a constitutional violation, even when done

11  under color of state law, unless it is accompanied by harm to "some more tangible interests."

12  <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976). A § 1983 plaintiff must show loss of a

13  constitutionally protected property or liberty interest in conjunction with the allegation of

14  injury to reputation. <u>See</u> <u>Cooper v. Dupnik</u>, 924 F.2d 1520, 1532 (9th Cir. 1991), <u>aff'd on</u>

15  <u>this ground on reh'g en banc</u>, 963 F.2d 1220, 1235 n.6 (9th Cir.) (en banc), <u>cert. denied</u>, 506

16  U.S. 953 (1992). This has become known as the "stigma-plus" test. <u>See</u> <u>id.</u> There are two

17  ways to meet the stigma-plus test: by showing that the injury to reputation caused the denial

18  of a federally protected right or by showing that the injury to reputation was inflicted in

19  connection with a federally protected right. <u>See</u> <u>id.</u>; <u>see, e.g.</u>, <u>Stevens v. Rifkin</u>, 608 F. Supp.

20  710, 726-27 (N.D. Cal. 1984) (plaintiff stated § 1983 claim by alleging that prosecutor

21  disseminated accusations to press in attempt to deprive plaintiff of his 6th Amendment right

22  to impartial jury panel); <u>id.</u> at 727 (plaintiff stated § 1983 claim by alleging defamatory

23  statements were made in connection with alleged unconstitutional arrest and prosecution).

24      Azam's amended complaint alleges that he was defamed by the defendants' acts of

25  identifying him as a kidnapper on August 30, 2003, as being Middle Eastern and as being

26  armed and dangerous. The amended complaint suggests that these defamatory statements

27  were done to affect public perception of him which would deprive him of an unbiased jury

28  pool and fair trial and set in motion child protective proceedings.

23

Defendants urge that there is an absence of evidence to show that their statements caused the deprivation of a federally protected right, i.e., that Azam cannot show a triable issue of fact on the "plus" part of the stigma-plus test. Defendants further argue that there is an absence of evidence to show that their statements were defamatory.

Azam fails to raise a triable issue of fact that the allegedly defamatory statements caused the deprivation of a federally protected right or were made in connection with a federally protected right. Most of the statements were made before he was even arrested, and at least most of them clearly were cast in terms of what police suspected he had done or had received reports he had done. He offers nothing more than speculation that the statements were made to influence his bail amount. He also provides no evidence to support his allegation that the defendants acted to interfere with his parental rights; the evidence he submits on the child custody proceedings indicates that the child custody proceedings were based on a much larger picture of domestic violence than just the August 30 events and that the child custody judge recognized that the allegations regarding August 30 were only pending unproven charges.

Azam also asserts that the allegedly defamatory statements interfered with his right to an unbiased "jury pool" and fair trial. Azam Decl., ¶ 217. A criminal defendant has a constitutional right to be tried by an unbiased jury, but does not have a constitutional right to an unbiased community or pool from which that jury will be selected. The main purpose of the jury selection process is to avoid biased people being put on the jury that will hear the case. Azam's evidence showing a prospective juror who had heard about his case or may have harbored ill feelings about Middle Eastern people does not show or support an inference that his trial was unfair but only that the juror should have been rejected if he was biased. Azam also cannot challenge the fairness of the overall trial because of the existing convictions on other counts. See Heck v. Humphrey, 512 U.S. 477, 486-87 (1994). If the jury at Azam's trial was biased, that bias would have tainted the whole proceeding, not just the charges that didn't result in convictions, and Heck bars a tainted-trial contention. Azam also fails to provide any evidence to support his theory that the allegedly defamatory

24

statement affected the testimony of an expert witness.  That an expert may have heard of his case – a fact that is difficult to determine because Azam included such a limited part of the transcript – does not mean that the expert heard or recalled any of the allegedly defamatory statements, that the information he heard had any effect on his testimony, or that the information he heard was information provided by the defendants.

Azam makes much of the alleged taint that resulted from him being identified as Middle Eastern, but he fails to show a triable issue of fact that defendants did this to interfere with his parental or criminal trial rights.  He provided no competent evidence to dispute defendants' evidence that their description was based on a computer record system that erroneously identified him as Middle Eastern.  Also, Azam's criminal defense attorney stated that Azam had "a last name that sounds Arabic," Azam Decl., Exh. Z5, and Azam (in his state habeas action) referred to his last name as sounding Arabic, which undermines the idea that defendants' reference to him as Middle Eastern (rather than the name itself) was the source of any alleged bias in prospective jurors.

In light of defendants' entitlement to summary judgment due to the lack of evidence on one essential element of the § 1983 defamation claim, it is unnecessary to reach the question of whether there is a triable issue of fact on the truthfulness of defendants' allegedly defamatory statements.

D.    Monell Claim

Azam alleges in his amended complaint that the City of Pleasanton and Pleasanton police department are liable on a theory that they failed to properly train the police employees on the proper usage of the Amber Alert system, and the investigation of crimes such as those Azam was alleged to have committed on August 30.  He also alleges that the City of Pleasanton "implemented an unconstitutional custom, policy or practice by negligently or intentionally failing to properly instruct, supervise, control and discipline it's [sic] Police Department and Officers within it's [sic] Department on correct procedures for investigating and reporting on" kidnapping and false imprisonment crimes and that the officers' resulting malicious prosecution and filing of false criminal charges violated his

"liberty rights."  Amended Complaint, p. 11.

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, see Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978); however, a municipality may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior, see Board of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Monell, 436 U.S. at 691.  To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that the policy amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy was the moving force behind the constitutional violation.  See Plumeau v. School Dist. #40 County of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997).

A municipality may be liable for constitutional violations resulting from its failure to train its workers where the inadequacy of the training amounts to deliberate indifference to the rights of the people with whom the municipality comes into contact.  See City of Canton v. Harris, 489 U.S. 378, 388 (1989); Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996); Mackinney v. Nielsen, 69 F.3d 1002, 1010 (9th Cir. 1995).  Only where a failure to train reflects a "'deliberate' or 'conscious' choice" by a municipality can it be thought of as a municipality's policy or custom that can support liability under § 1983.  See Harris, 489 U.S. at 389.  It is not enough to simply say that a training program represents a policy for which the municipality is responsible.

> That much may be true.  The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."  It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

Id. at 389-90.  The appropriate inquiry on the causation issue is whether the injury would

have been avoided "had the employee been trained under a program that was not deficient in the identified respect." Id. at 391. But-for causation is not enough; "[r]ather, the policy must be the proximate cause of the section 1983 injury." Van Ort, 92 F.3d at 837. As in traditional tort cases, an intervening cause may break the chain of proximate causation in a § 1983 action. See id. (defendant's unforeseeable private acts defeated proximate cause connecting county's alleged negligence to plaintiffs' injuries). Rigorous standards of culpability and causation must be applied to ensure that a municipality will not be held liable solely for the actions of its employee on a prohibited respondeat superior theory. See Board of County Comm'rs v. Brown, 520 U.S. at 405.

The starting point here is to note the limited nature of the liability question. The City of Pleasanton and its police department cannot be held liable merely because they employed the other defendants -- that would be impermissible respondeat superior liability. See Monell, 436 U.S. at 694. Because there is no potential for respondeat superior liability, the City of Pleasanton and its police department can avoid liability even if their employees engaged in unconstitutional behavior if the municipal entities can show they were not liable on a policy or failure-to-train theory.

Azam fails to produce evidence sufficient to raise a triable issue of fact on his Monell claim. Azam presents evidence that supports a finding that the Pleasanton police department's protocol did not have identical criteria for activating an Amber Alert as those listed in the State manual. Compare Azam Decl., Exh. Y (Pleasanton protocol listing first of three criteria as "Confirmed child (under 18 years of age) abduction has occurred and all other alternatives have been ruled out") with Exh. Y2 (State manual listing first two of four criteria as: (1) "It has been confirmed that an abduction has occurred. [(2)] The victim is 17 years of age or younger, or of proven mental or physical disability.") The State manual, unlike the Pleasanton protocol, refines the abduction criteria by defining a child abduction as "an incident in which a child is reported to be involuntarily missing from the person(s) having care-taking responsibilities for the child. Absent an eyewitness to the abduction, agencies should have reliable evidence that the child's disappearance was not voluntary."

Azam Decl., Exh. Y2.  He argues that this discrepancy allowed the Amber Alert system to be activated in a case where a child was with a custodial parent with care-taking responsibilities. Even if this is true, the Pleasanton protocol required that there be a confirmed child abduction and that all other alternatives to an abduction had been ruled out.  The Pleasanton protocol, if followed, would not have been activated if there was not an abduction of a child. More importantly, the difference in wording between the protocol and State manual made no difference in Azam's case because the undisputed evidence is that the Pleasanton police department officers used the State manual as a resource to execute the protocol, referred to the manual to make the determination that the criteria had been met on August 30, and consulted a state official.  After the police reviewed the facts and criteria with him, a CHP "officer concurred that the criteria had been met and authorized an Amber Alert to locate Alina."  Mickleburg Decl., ¶ 18.  In other words, the circumstances believed by the Pleasanton police to exist sufficed to activate the Amber Alert under the State manual as well as the Pleasanton protocol.  No reasonable jury could conclude that the Pleasanton protocol reflected a policy that amounted to deliberate indifference to Azam's constitutional rights and was the moving force behind a violation of his constitutional rights.

Azam also argues that City of Pleasanton and the Pleasanton police department failed to properly train their employees in ascertaining the actual age of the alleged victim before initiating the Amber Alert.  His proof on this point is that the Amber Alert was activated for Jennifer and Alina, although only Alina was a minor as to whom the Amber Alert system properly could be activated.  He offers no evidence that the police were ever trained to use the Amber Alert system for an abducted adult; at most, Azam shows they acted contrary to their undisputed training and the protocol.  Further, while it is true that the Amber Alert system is not set up for missing able-bodied adults, there is no dispute that the Amber Alert issued here was for mother <u>with child</u> and never for the mother alone.  Even if the Amber Alert system had been activated for an adult victim as a result of a failure to train the police as to the victim's age requirements, the use of a public alert system for an adult crime victim would not interfere with any legally recognized interest of the alleged perpetrator.  More

1   importantly, even if there had been a custom or failure to train on victim age requirements,

2   Azam fails to show how any such deficiency amounted to a deliberate indifference to his

3   constitutional rights or that there was any causal connection between the custom or lack of

4   training and a deprivation of any of his constitutional rights.

5          The City of Pleasanton and its police department have identified the portions of the

6   record which demonstrate the absence of a genuine issue of material fact that there was a

7   policy or failure to train that amounted to deliberate indifference to Azam's constitutional

8   rights and that the policy or failure to train was the moving force behind the alleged

9   constitutional violation. Azam does not meet his burden to designate specific facts showing

10  that there is a genuine issue for trial on these essential elements of his claim. The City and

11  police department therefore are entitled to judgment as a matter of law.

12  E.     Miscellaneous Matters

13         Plaintiff's motion to strike defendants' separate statement of facts as not in compliance

14  with Local Rule 56-2 is GRANTED. (Docket # 57.) The court has not considered the

15  separate statement in ruling on the pending motion for summary judgment.

16         Defendants' application to strike plaintiff's opposition or in the alternative to extend

17  the time for defendants to file a reply brief is GRANTED. (Docket # 61.) The court will not

18  strike plaintiff's opposition but instead will deem defendants' reply brief filed September 21,

19  2007 to be timely filed.

20         Plaintiff's motion to stay proceedings in this action while he is a county jail for state

21  court proceedings is DENIED. (Docket # 65.) At the time he filed his motion, there was no

22  pending deadline in this action and no need for this action to be stalled for an undisclosed

23  amount of time while plaintiff tends to other litigation pending in state court. Now that the

24  court has granted summary judgment, plaintiff may wish to appeal. If he needs an extension

25  of time to file a notice of appeal, he should promptly file a motion for an extension of time

26  and explain how much time he needs and why he needs it.

27

28

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED.  (Docket # 53.)  Judgment will be entered in defendants' favor and against plaintiff.  The clerk will close the file.

IT IS SO ORDERED.

Dated: January 7, 2008

_____
Marilyn Hall Patel
United States District Judge